IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

LEE OTIS CASTERLOW,     )
                          )
    Plaintiff,       )
                          )
v.                     )     No. <u>06-2575 Ma/P</u>
                          )
MICHAEL J. ASTRUE,     )
COMMISSIONER            )
OF SOCIAL SECURITY,    )
                          )
    Defendant.       )

---

## REPORT AND RECOMMENDATION

---

Plaintiff Lee Otis Casterlow appeals from a final decision of the Commissioner of Social Security[1] (the "Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u> and for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 <u>et seq</u>. The appeal was referred to the United States Magistrate Judge for a report and recommendation. Based on the entire record in this case, the court proposes the following findings of fact and conclusions of law and recommends that Casterlow's appeal be denied and the Commissioner's decision be affirmed.

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, while this appeal was pending. Therefore, Astrue has been substituted for the former Commissioner, Jo Anne B. Barnhart, as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g).

## I.  PROPOSED FINDINGS OF FACT

Casterlow filed his application for Supplemental Security Income benefits on April 16, 2004, and for disability insurance benefits on April 20, 2004. (R. at 12, 74-76). He alleged a disability onset date of March 15, 2004, citing human immunodeficiency virus ("HIV") infection, heart disease, and mental problems. (R. at 61). The Social Security Administration denied his application initially on July 23, 2004, (R. at 64-67), and upon reconsideration on December 8, 2004.[2] (R. at 69-70). At his request, a hearing was held before Administrative Law Judge ("ALJ") Paul Michael Stimson on November 9, 2005. (R. at 34-59). The ALJ issued a written decision on February 6, 2006, denying Casterlow's claims. (R. at 9-20). After the Appeals Council denied his request for review on June 24, 2006, (R. at 3-5), Casterlow filed the instant appeal in the Western District of Tennessee on August 23, 2006.

### A.  Medical History

Casterlow was born on September 25, 1945, and claims to have been disabled since March 15, 2004, due to HIV infection as well as heart disease and mental problems. (R. at 61-62). At the time of his hearing, Casterlow was sixty years old. (R. at 37). He is 5'10" tall and weighs between 160-170 pounds. (R. at 129, 195).

---

[2]Casterlow had also filed claims on March 21, 1977, November 27, 1998, and December 15, 1998, all of which were denied and were not further pursued by him on appeal. (R. at 12).

He graduated from high school and attended some vocational training in upholstery but did not complete the program. (R. at 38). Casterlow was in the United States Navy from January 10, 1964 to December 28, 1967.[3] (R. at 38, 74, 273). He worked in the laundry of a ship in the South China Sea. (R. at 193). His ship was hit with shellfire, and several men were killed although Casterlow was not injured. (R. at 193-94). He received an honorable discharge after four years of service. (R. at 194). Casterlow then worked as a janitor at the Regional Medical Center in Memphis, Tennessee, for thirty-five years, cleaning emergency rooms. (Id.). In 1994, he quit so that he could go to Chicago to care for his mother when she fell ill. (Id.). When he returned to Memphis in 2001, Casterlow began working at Memphis Net and Twine where he moved bales of nets that weighed about 400-500 pounds. (R. at 99, 101, 110, 194). He was fired from that job in April of 2004 because he could not keep up with his workload. (R. at 194). He has not worked since that time. (Id.). Casterlow is single and has never been married. (R. at 74). He has two adult children. (R. at 134). At the time of the hearing, Casterlow was living with his niece, Ceisammie Casterlow ("Ceisammie"), and her family. (R. at

---

[3]Casterlow was granted non-service related disability pension benefits from the Department of Veterans Affairs, effective on June 27, 2005, in the amount of $846.00 per month based on "congestive heart failure, hiatal hernia with gastroesophageal reflux disease, hemorrhoids, and human immunodeficiency virus disease." (R. at 268-71).

50).

Casterlow's medical records indicate that he has a history of alcohol, cocaine, and marijuana abuse and that he has engaged in "lots of unprotected sex" and sex with prostitutes. (R. at 128, 227, 235). He attended a drug rehabilitation program at a Veteran's Administration Hospital in the 1970s or 1980s. (R. at 138). He also participated in a substance abuse rehabilitation program from February 18, 2003 to March 4, 2003, because his treating physician, Dr. Gail Berntson, informed Casterlow that he could not be maintained on HIV medication without demonstrating stability and sobriety. (Id.). During the program, he was diagnosed with alcohol and cocaine dependency, HIV, history of congestive heart failure, and severe stressors including HIV diagnosis, chronic drug addiction, and a poor support system. (Id.). He was assigned a Global Assessment of Functioning ("GAF")[4]

_____

[4]GAF ratings are subjective determinations based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual Mental of Mental Disorders (4th ed. 2000) at 32 ("DSM-IV Manual"). Each range can be described as follows: a GAF score in the range of 1-10 indicates "persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death;" a GAF score in the range of 11-20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication;" a GAF score in the range of 21-30 indicates "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas;" a GAF score in the range 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a

of forty-five on admission to the program and of fifty-five on discharge. (Id.). Since participation in the program, Casterlow claims to have reduced his smoking from two packs per day to two cigarettes per day and to have stopped using drugs and alcohol. (R. at 194, 213, 235, 251-52).

Casterlow's medical records also show that he was treated for gonorrhea in the 1970s, "throwing up blood" in 1980, and for a broken arm in 1990. (R. at 194). Casterlow was hospitalized in 2001 for having fluid on his heart, and he has been diagnosed at various times with congestive heart failure, borderline cardiomegaly, and left ventricular hypertrophy. (R. at 128, 185, 194, 223). An examination during Casterlow's substance abuse

---

GAF score in the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers);" a GAF score in the range of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships;" a GAF score in the range of 71-80 indicates "if symptoms are present, they are transient and an expectable reaction psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork));" a GAF score in the range of 81-90 indicates "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." Id. at 34.

rehabilitation program revealed no current evidence of congestive heart failure or significant abnormalities. (R. at 139). On May 4, 2004, an examination revealed that his heart condition was stable with treatment, although he was experiencing unrelated heartburn symptoms. (R. at 246-47). Further, on August 18, 2004, an examination revealed that Casterlow's chest was clear. (R. at 225).

Casterlow was also diagnosed with HIV infection in September of 2002, after trying to give blood. (R. at 194). He began antiviral therapy in late 2002. (R. at 131). As of July 14, 2004, Casterlow's CD4 count was 176, which puts him at high risk for opportunistic infections although no such infections have occurred. (R. at 244). Additionally, upon discharge from his rehabilitation program, his white blood cell count was low-normal. (R. at 138). Casterlow has also been diagnosed with flattened diaphragms, cephalization, and perihilar opacities related to his smoking. (R. at 128).

Casterlow was treated for shingles in July and August of 2004. (R. at 223, 239). He suffered from constipation in August of 2004 as a side effect of the medication he was taking to treat his shingles. (R. at 221, 232, 234-35). A medical examination revealed that Casterlow had no acute bony abnormalities, his bowel gas pattern was normal, and he had no abnormal calcifications or fluid collection in his abdomen. (R. at 221). Casterlow has also

sought medical treatment for post-shingles pain, feeling weak, tightness in his chest, and blood in his stool. (R. at 223, 248). On August 4, 2004, Casterlow sought treatment for back pain. (R. at 237). At that time, he reported that his pain was an eight on a scale of one to ten. (Id.). On August 25, 2004, Casterlow reported that his pain was a twelve on a scale of one to ten and that percoset was not relieving it. (R. At 225). On August 20, 2004, he also reported having a small, painful bump near his naval that appeared after he started taking pain medication. (R. at 224). His physician stated that it could have been related to his shingles, and he did not report the problem again. (Id.). Additionally, Casterlow has worn glasses since 1969, although his medical records show that he has no ocular complications related to his HIV infection. (R. at 93, 128). On February 23, 2004, Casterlow received new glasses and reported no problems with his vision during the subsequent months. (R. at 141, 242-43). As of March 23, 2005, Casterlow was on the following medications: Gatifloxacin 400 mg, Benzonatate 100 mg, Folic Acid 1 mg, Thiamine HCL 100 mg, Ibuprophen 600 mg, Lamivudine 150 mg, Zidovudine 300 mg, Lopinavir 133.3 mg, Ritonavir 33.3 mg, Sulfamthoxazole 800 mg, Trimeth 160 mg, Aspirin 325 mg, Furosemide 40 mg, Lisonopril 10 mg, Omeprazole 20 mg, Gabapentin 300 mg, Amitriptyline HCL 10 mg, Acyclovir 5% Ointment 15 g, Artificial Tears Polyvinyl Alcohol, Potassium Chloride 10 mEq, and Naproxen 250 mg. (R. at 77-78). In

April of 2005, Casterlow attended mental health counseling at Friends for Life. (R. at 81).

According to a Physical Residual Functional Capacity ("RFC") Assessment Form completed by Dr. Glenda Knox-Carter on June 16, 2004, Casterlow could occasionally lift or carry fifty pounds, and he could frequently lift or carry twenty-five pounds. (R. at 186). Additionally, he could stand or walk for a total of six hours in an eight-hour workday, and he could sit for a total of six hours during an eight-hour workday. (Id.). Casterlow's ability to push and pull was unlimited. (Id.). Dr. Knox-Carter also found that Casterlow had no postural, manipulative, visual, communicative or environmental limitations. (R. at 187-89). Dr. Knox-Carter gave Casterlow a primary diagnosis of HIV infection, a secondary diagnosis of cardiomegaly, and she noted that he had abused cocaine. (R. at 185). Dr. Knox-Carter found no indication that Casterlow had any opportunistic, HIV-related infections, and she found that his level of impairment was severe but short of the listing level. (R. at 187). She also found that Casterlow suffered from fatigue related to his HIV treatment. (Id.). Further, Dr. Knox-Carter found that Casterlow's allegations of pain were only partially credible. (R. at 190).

Dr. Celia Gulbenk also completed a Physical RFC Assessment Form on December 2, 2004. (R. at 260-67). Although Dr. Gulbenk reached many of the same conclusions as Dr. Knox-Carter, she found

that Casterlow had some postural limitations. (<u>Id.</u>). Further, Dr. Gulbenk noted that although Casterlow suffered from shingles in August, 2004, he did not have any HIV-related infections. (R. at 261). She also found that his lungs were clear. (<u>Id.</u>). Dr. Gulbenk diagnosed Casterlow with cardiomyopathy, HIV infection, anemia, seizures, and shortness of breath. (R. at 260).

Dr. Troy Cole performed a Mental Status Examination on Casterlow on July 7, 2004. (R. at 193-99). Dr. Cole conducted a clinical interview and mental status exam, made behavioral observations, and reviewed Casterlow's disability report. (R. at 193). Dr. Cole found that Casterlow had no difficulty with hearing or speech, although his niece Ceisammie claimed that he had some difficulties. (R. at 194). Casterlow did not display any indications of loosening associations or delusions, although he stated that he sometimes hears voices when he has bad dreams. (R. at 196). Dr. Cole concluded that Casterlow's symptoms appeared to be valid, and he was well-oriented to the time, place, person, and purpose for his mental status examination. (<u>Id.</u>). Dr. Cole also found that Casterlow had poor short term memory, as he could only remember one out of three objects after five minutes. (<u>Id.</u>). Casterlow had satisfactory immediate memory, as he could recall five digits forward and three backward, and he had good long-term memory, as he could recall details from his childhood, his social security number, and the name of the elementary school he attended.

(Id.).   Additionally, Casterlow had satisfactory math and concentration skills because he could count backward by sevens from 100 to eighty-six without difficulty. (Id.). Dr. Cole found that Casterlow was sufficiently informed about world events and news through watching television, and that Casterlow could spell the word "world" backward.   (Id.).   Dr. Cole noted that Casterlow arrived on time, had satisfactory grooming, was cooperative, made good eye contact, and he observed that Casterlow was both anxious and friendly.  (R. at 194-95).   He also observed that although Casterlow arrived in a wheelchair, he did not appear to use it all of the time.  (R. at 195).   Dr. Cole found that Casterlow was eating well and had gone from 140 pounds to 170 pounds.  (R. at 196).  Further, Dr. Cole noted that Casterlow spoke at a normal volume and rate, he was understandable, and he had no articulation difficulties.  (Id.).   Additionally, Casterlow had good judgment and impulse control.  (Id.).   Dr. Cole also found that Casterlow exhibited satisfactory attention and that he demonstrated good abstract reasoning skills.   (R. at 196-97).   There were no indications of suicidal or homicidal ideation, and Dr. Cole found Casterlow to be of average intelligence. (R. at 197). Dr. Cole also made the following observations

> Mr. Casterlow reported that he has difficulty sleeping at night.  He sleeps in a restless manner and may not go to sleep until 4:00 am.  He takes medication during the day and takes naps.  He wakes up at 7:00 am. He is able to take care of his own personal hygiene and grooming.  However, he waits for others to take care of

other chores such as cooking, cleaning, and shopping. In the past, he had a checking account and took care of his own money but does not do so now. His niece reported that it is "very hard for him to do anything because he loses his breath and can't stand for long periods of time."

Mr. Casterlow has a driver's license but does not drive. He does not ride a bus. He does attend church. He visits with family members. He does not have a girlfriend. During the day, he watches television or sits on the couch. His niece likes to take him out and interact with other members of the family. He does not talk on the phone. When is having a good day, he reported, "When I'm able to get off the couch and do things for myself." When is having a bad day, "When I sleep all day because I am in a lot of pain."

(<u>Id.</u>).

Dr. Cole also found that Casterlow needed prompting to complete activities of daily living and that he performed activities appropriately, although he had difficulty sustaining activities on a daily basis. (R. at 197-98). Dr. Cole diagnosed Casterlow with anxiety disorder not otherwise specified, identified that Casterlow had problems with occupation and money, and assigned him a GAF of sixty-five. (R. at 198). Dr. Cole found that Casterlow had mild limitations in understanding and remembering, sustaining concentration and persistence, and adapting to changes and requirements, and he had no limitations in interacting with others. (<u>Id.</u>). Finally, Dr. Cole stated that if benefits were assigned, Casterlow did not need a caretaker. (<u>Id.</u>).

Dr. Rebecca Hansmann completed a Mental RFC Assessment Form on Casterlow on July 20, 2004. (R. at 200-16). Dr. Hansmann found

that Casterlow was not significantly limited in his understanding and memory or his abilities to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, and to make simple work-related decisions. (R. at 200). She also found that Casterlow was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Id.). Dr. Hansmann found that Casterlow was moderately limited in his abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting. (Id.). She also found that Casterlow was not significantly limited in his abilities to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places, and to set realistic

goals or make plans independently of others. (R. at 201). In her summary assessment, Dr. Hansmann stated that Casterlow had no significant limitations, he could concentrate and persist for simple and low-level detailed tasks despite episodes of increased signs and symptoms, he would have some, but not substantial, difficulty in dealing effectively with co-workers and the public, and he could adapt to infrequent changes. (R. at 202). Dr. Hansmann also noted that Casterlow was limited in his activities of daily living primarily because of fatigue and pain and that he needed assistance and reminders for grooming. (R. at 207). She further observed that "medical problems are clearly the primary source of decreased functioning" and that Casterlow had moderate psychiatric limitations, including anxiety with decreased CPP, social withdrawal, and difficulty completing activities of daily living. (Id.). She diagnosed Casterlow with anxiety disorder not otherwise specified and polysubstance dependence in reported remission. (R. at 210). Finally, Dr. Hansmann found that Casterlow's allegations were credible and consistent with the medical evidence of record. (R. at 207).

**B. Casterlow's Allegations of Disability**

In his application and appeals for disability benefits, Casterlow claims that he cannot work because he is experiencing pain, fatigue due to his HIV medication, shortness of breath, "bad nerves," and seizures. (R. at 79, 83, 86-88, 91). He also claims

that he has been depressed since he was diagnosed with HIV infection, that he has difficulty sleeping, and that he has difficulty in caring for his personal needs because he has no desire and he is "drowsy 90% of the day." (R. at 83, 85). He also states that he has developed a persistent cold and frequently breaks out in cold sweat. (R. at 79). His niece, Cherseida Casterlow, also claims that Casterlow cannot be left alone because he tries to set things on fire, "tear up things," and "cut up furniture." (R. at 85). Casterlow states that he is in nearly constant pain all over his body. (R. at 89). He states that his pain medicine makes him drowsy and dizzy, that he cannot enjoy anything, and that he has trouble eating. (R. at 89-90). Additionally, Casterlow claims that he can barely walk from room to room without getting out of breath and that he has no energy or will power and is "barely living". (R. at 90). Casterlow claims that his medicine makes him so tired that he must take four one-hour naps throughout the day and that he can only be active for about ten to fifteen minutes before he must rest for three to four hours. (R. at 108). His sister-in-law, Vivian Casterlow, asserts that Casterlow can be active for only thirty minutes at a time before he must rest for one hour. (R. at 94). Casterlow states that he does not go out of his home, he does no chores or cooking, his only activities are sleeping, eating, and using the bathroom, and his pain only goes away while he is sleeping. (R. at 94-96).

-14-

He also reports, however, that his pain medication relieves his pain for four to five hours. (R. at 95). He claims that he moves in slow motion but that he is nervous and jerky. (R. at 108).

Vivian Casterlow also states in a Disability Report form that Casterlow cannot sleep for a long period of time, he wears the same clothes for days and had not bathed himself in three months, he does not comb his hair or shave, he does not feed himself, and he needs help going to the bathroom and taking his medicine. (R. at 119). She also reports that Casterlow will not go out because he is afraid that he might wonder off or someone might hurt him, and he cannot pay his bills. (R. at 121). Vivian Casterlow also reports that Casterlow watches television all day but does not appear to pay attention and that he can only concentrate on something for one or two minutes at a time. (R. at 122-23). Further, she states that Casterlow has trouble lifting, standing, walking, sitting, talking, hearing, seeing, remembering, using his hands, completing tasks, concentrating, understanding, following instructions, and getting along with others. (R. at 123).

## C.    Disability Determinations

Anthony C. Roberson, a disability examiner, and Dr. Knox-Carter, completed Casterlow's Disability Determination on July 22, 2004. (R. at 60-61). They found that Casterlow had a primary diagnosis of affective/mood disorders and a secondary diagnosis of HIV infection. (R. at 60). They also found that Casterlow could

do most daily activities and that he had no disabling HIV complications. Further, they found that although Casterlow had mental problems, he could still communicate, act in his best interest, and perform most ordinary activities. (R. at 61). They also concluded that Casterlow's condition was not severe enough to keep him from working and that he could perform his job as a janitor based on his description of that job. (Id.).

Disability examiner Kristi Davison and Dr. Gulbenk also performed a disability determination on December 7, 2004. (R. at 62-63). They came to substantially the same conclusions as Roberson and Dr. Knox-Carter, and confirmed the July 21, 2004, determination. Additionally, Davison and Dr. Gulbenk found that Casterlow's heart beat and function were satisfactory for normal activities. (R. at 63).

## D.  Administrative Hearing

Casterlow appeared at a hearing before ALJ Stimson in Memphis, Tennessee, on November 9, 2005. He was represented by attorney R. David Strickland. Casterlow and his niece Ceisammie both testified at the hearing. Casterlow testified that he graduated high school, attended but did not complete vocational training, and did not attend college. (R. at 38). He testified that he served in the Navy but did not get any vocational training through the military. (Id.). Casterlow also stated that he had worked as a janitor, which required him to be on his feet all day, to bend, to be on his

knees while he cleaned under operating tables, and to move furniture. (R. at 38-39). Casterlow testified that at his job at Memphis Net and Twine, he was required to move bales of nets that weighed about 400-500 pounds. (R. at 39). He testified that the job required him to be on his feet all day and that he had to pull and lift the bales. (Id.). Casterlow also stated that he lived with his niece and her husband who did all the housework, took care of Casterlow's finances, and reminded him to take his medicine on a regular basis. (R. at 45-46).

Casterlow also testified that he had HIV infection, he had suffered a heart attack several years ago and continued to suffer from congestive heart failure, he had gastroesophageal reflux disease, and he suffered from seizures. (R. at 40). He said that he had been hospitalized four times within the past fifteen months as of the date of the hearing. (R. at 45). He testified that he was extremely fatigued by his HIV infection, his medications, and his heart disease. (R. at 41). He said that he took at least eight different medications twice a day in addition to potassium tablets, aspirin, and other medication. (Id.). He also stated that the medication caused him to be dizzy and made his eyes dry, which required him to use eye drops every day. (R. at 42-43).

Casterlow testified that he could not lift even two pounds more than two or three times because he had no strength, and he could not be on his feet for an hour. (R. at 42). He stated that

he could only walk about half a block at a time before getting tired and short of breath. (R. at 42, 49). Casterlow stated that he cannot bend, stoop, or squat, and that he must sleep during the day for about four hours. (R. at 43-44). Casterlow also testified that he was taking twenty percosets a day for his shingles. (R. at 44).

Casterlow testified about his emotional and mental state. (R. at 46). He stated that he has not had a relationship with a woman since being diagnosed with HIV. (R. at 46-47). He also stated that he is depressed, has thoughts of suicide, and does not want to be around other people. (R. at 47). He stated that he had not used alcohol or cocaine since he started taking his HIV medication in April of 2004. (R. at 47-48). Finally, he claimed that he had trouble remembering things and following directions. (R. at 48).

Ceisammie testified that she and her husband lived with Casterlow and looked after all of his needs. (R. at 50-51). Specifically, she stated that she did all the cooking, washing, housework, and got all of Casterlow's prescriptions for him because he was not physically able to do those things for himself. (R. at 51). She said that Casterlow goes right back to sleep in the morning after taking his medication. (<u>Id.</u>). She also stated that Casterlow gets out of breath when walking from room to room and that he is in pain when he is not sleeping. (R. at 52). Ceisammie also testified that Casterlow is drained of all energy and does not

like to be around anyone. (R. at 53). She stated that he has very low self-esteem, low concentration, and that he lashes out at people. (R. at 53-54). She testified that she did not think that Casterlow could understand or carry out simple instructions in a job setting and that he would have extreme or significant problems dealing with coworkers, bosses, and the public. (R. at 54). Finally, she stated that Casterlow cannot stand up for more than five minutes. (R. at 54-55).

At the conclusion of the hearing, the ALJ stated that he would hold the record open until December 1, 2005, so that Casterlow's attorney could provide him with an RFC Assessment from one of Casterlow's treating physicians, medical records concerning Casterlow's heart condition, and comments from a physician stating that Casterlow met a disability listing. (R. at 55-57). None of this information, however, was ever provided to the ALJ. (R. at 15).

## E.    The ALJ's Decision

The ALJ issued his decision denying Casterlow's claims on February 6, 2005. (R. at 9-20). Applying the five-step sequential disability analysis,[5] the ALJ found at steps one and two that

---

[5]Entitlement to Social Security disability benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be engaged in substantial gainful activity for a period of not less than twelve months. 20 C.F.R. § 404.1520(c). Second, a finding must be made that the claimant suffers from a severe impairment. Id. Third, the ALJ must determine whether the

Casterlow satisfied the nondisability requirements set forth in Section 216(I) of the Social Security Act and is insured for disability benefits through the date of his decision, he had not engaged in substantial gainful activity since the alleged onset of the disability, and Casterlow's cardiomegaly and HIV infection impairments were "severe" based on the requirements of the regulations. 20 C.F.R. § 404.1520(c); (R. at 13-14). The ALJ determined, however, that Casterlow's medically determinable impairments did not meet or medically equal, either singly or in combination, any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). (R. at 14). Additionally, he noted that no doctor in the record had indicated that a criteria of the Listings was met or equaled. (<u>Id.</u>). Thus, the ALJ had to determine Casterlow's RFC to perform the requirements of his past work or other work existing in significant numbers in the national economy. (R. at 14).

The ALJ opined that Casterlow retains the RFC to perform medium work. (R. at 15). He stated that Casterlow can lift a

_____

impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. 20 C.F.R. §§ 404.1520(d), 404.1525, 505.1526. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the residual functional capacity to return to any past relevant work. 20 C.F.R. § 404.1520(e). If the ALJ finds the claimant unable to perform past relevant work, then, at the fifth step, the ALJ must determine whether the claimant can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(f).

maximum of fifty pounds occasionally and twenty-five pounds frequently, he can stand or walk for six hours total and sit for two hours total in an eight-hour workday. (Id.). The ALJ found as credible Casterlow's claim that he would experience pain and fatigue with heavy lifting, and reduced his functional capacity accordingly. (Id.). ALJ Stimson stated, however, that he did not find as credible Casterlow and Ceisammie's testimony that he was incapable of all work activity because of significant inconsistencies in the record as a whole. (Id.). The ALJ found that the objective medical evidence was fully consistent with the RFC he assigned and inconsistent with an inability to work due to disabling levels of pain, fatigue, shortness of breath, and heart problems. (Id.). He also found that the record did not support the level of negative side effects of Casterlow's medication that Casterlow reported. (R. at 16).

The ALJ stated that he gave significant weight to the medical source statements provided by the Tennessee State agency medical consultants who conducted RFC assessments, Dr. Knox-Carter and Dr. Gulbenk, because their assessments were supported by the record as a whole. (R. at 16). For the same reason, the ALJ gave significant weight to the Mental Status Evaluation conducted by Dr. Cole. (Id.). ALJ Stimson gave less weight to Dr. Hansmann's non-examining assessment that Casterlow had some moderate limitations because her assessment conflicted with the record as a whole and

with Dr. Cole's examining assessment.  (<u>Id.</u>).

The ALJ did not include any limitations in the RFC based on mental health limitations because he found that Casterlow's mental health limitations were "no more than mild."  (R. at 16). Additionally, he noted that Casterlow stated that he was not in mental health counseling, which was inconsistent with a finding of a mental health disability.  (<u>Id.</u>).  The ALJ also placed great weight on Dr. Cole's evaluation. (<u>Id.</u>).  The ALJ found that Casterlow's mental impairment had not resulted in decompensation in work or work-like settings.  (R. at 17).  Additionally, the ALJ found no evidence that contradicted Casterlow's testimony that he had not abused alcohol or drugs since April of 2004.

Next, the ALJ noted that he was not bound, under 20 C.F.R. §§ 404.1504 and 416.904, by the Department of Veterans Affairs decision to grant non-service disability pension benefits to Casterlow, because a decision regarding disability for purposes of disability insurance benefits and supplemental security income benefits are based on social security law.  (R. at 17).

Finally, the ALJ found that, based upon the RFC he assigned, Casterlow was capable of performing his past relevant work as a janitor as Casterlow had performed it in the past.  (R. at 18). Thus, the ALJ concluded that Casterlow was not under a "disability" at any time through the date of his decision.  (<u>Id.</u>).

**F.    Request for Review**

Casterlow did not provide any additional evidence regarding his ability to work. In his request for review of the ALJ's decision, Casterlow stated that he was scheduled to have surgery on April 11, 2006, he is sometimes suicidal, and he had seen "three ghosts running in the house naked." (R. at 6). The Appeals Council denied Casterlow's request for review, and as a result, he filed the instant appeal in this district. (R. at 3-5).

## II. PROPOSED CONCLUSIONS OF LAW

In his *pro se* appeal, Casterlow contends that the ALJ's decision was not supported by substantial evidence and that the ALJ committed errors of law and applied improper or incorrect legal standards. In his one-page brief, Casterlow states that he should be granted benefits because of the side effects of his medication, his age, difficulty walking, heart problems, HIV, and because he is experiencing depression and suicidal thoughts.

## A. Standard of Review

Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision, 42 U.S.C. § 405(g); Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 840 (6th Cir. 1997), and whether the correct legal standards were applied. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). When the record contains substantial evidence to support the Commissioner's decision, the decision must be affirmed. Stanley v. Sec'y of Health & Human Servs., 39 F.3d 115,

117 (6th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401 (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. <u>Abbott v. Sullivan</u>, 905 F.2d 918, 923 (6th Cir. 1990). When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion. <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994). Similarly, the court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994).

## B.   Substantial Evidence Supports the ALJ's Decision

The court submits that the ALJ's decision is supported by substantial evidence and that the ALJ applied the correct legal standards. The claimant carries the ultimate burden of establishing the existence of a disability, which includes proving that his impairment meets or equals a listed impairment. <u>Lancaster v. Comm'r of Soc. Sec.</u>, 228 Fed. Appx. 563, 571 (6th Cir. 2007). The court also submits that Casterlow did not carry his burden of

demonstrating that any of his impairments satisfied a Listing.

In reaching his decision, the ALJ appropriately discounted Casterlow's subjective complaints regarding pain, fatigue, shortness of breath, and heart problems. An "ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997). The ALJ, who was able to observe the witnesses during their testimony at the hearing, concluded that his complaints were not entirely credible based on several grounds. Id. at 531 (an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witnesses' demeanor and credibility). The ALJ noted that Casterlow's record of treatment was inconsistent with his complaints of fatigue and dizziness. He had not received any medical treatment for these alleged symptoms, nor did his medical records show that he complained of these side effects to his health care providers. See Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). Courts have found that the absence of treatment can be evidence that a claimant is not impaired. Hale v. Sec'y of Health

and Human Servs., 816 F.2d 1078, 1082 (6th Cir. 1987). The ALJ also found that the objective medical evidence did not support Casterlow's complaints. Physical examinations revealed that Casterlow was not currently experiencing any heart problems, there was no medical documentation of seizure complaints or diagnosis, he had no opportunistic infections, his chest was clear, and his shingles and constipation had been adequately treated. Additionally, his Mental Status Evaluation revealed that Casterlow had a GAF of sixty-five, which indicates only mild limitations and that he was generally functioning well. On October 20, 2004, Casterlow's treating physician reported that Casterlow was "doing well." Further, although Casterlow reported pain to his treating physician, he has also stated that his medication relieves his pain for four to five hours. Impairments that are controllable or amenable to treatment cannot support a finding of disability. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

The ALJ erroneously stated that Casterlow was not attending mental health counseling. (R. at 16). In his Disability Report Appeal, Casterlow stated that he had an appointment at Friends for Life for counseling so that he could "talk to someone who is going through the same thing." (R. at 81). This error, however, does not justify overturning a decision that is otherwise supported by substantial evidence. Hill v. Barnhart, No. 02-2165, 2003 WL 21037402, at *8 (W.D. Tenn. 2003). Further, Casterlow's medical

records do not indicate that he had regularly participated in counseling, and seeking counseling to talk to others with similar experiences is consistent with the ALJ's finding of a mild, rather than a severe, mental health impairment. Additionally, Dr. Cole found that Casterlow had only mild limitations in some areas of functioning, and Dr. Hansmann found that Casterlow had only mild or moderate limitations in certain areas of functioning.

The assessments of Knox-Carter, Gulbenk, and Cole also provide substantial evidence to support the ALJ's RFC determination. Knox-Carter opined that Casterlow could occasionally lift or carry fifty pounds, he could frequently lift or carry twenty-five pounds, he could stand or walk for a total of six hours in an eight-hour workday, and he could sit for a total of six hours during an eight-hour workday. Knox-Carter found that Casterlow's ability to push and pull was unlimited, he had no postural, manipulative, visual, communicative or environmental limitations, found no indication that Casterlow had any opportunistic or HIV-related infections, and found that Casterlow's allegations of pain were only partially credible. Gulbenk reached many of the same conclusions as Dr. Knox-Carter, found that Casterlow had only some postural limitations, found that Casterlow did not have any HIV-related infections and that his lungs were clear. Cole found only mild degrees of limitations, and reported that Casterlow had normal speech, had no indications of psychosis, had good judgment and

satisfactory attention and concentration, had satisfactory immediate and long term memory, and exhibited no indications of suicidal or homicidal ideation. Cole opined that Casterlow was only mildly limited in the areas of mental functioning.

The ALJ found that Casterlow could return to his past relevant work. The claimant has the burden to prove that he cannot return to his past work. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987). The court submits that Casterlow has not carried his burden of proving that he cannot return to his past work as a janitor. Casterlow's age is not a factor in determining whether he can return to his past work. <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv). Additionally, Casterlow's medical records do not show that any of his treating physicians limited his ability to work or to participate in other daily activities. <u>See Sizemore v. Sec'y of Health and Human Servs.</u>, 865 F.2d 709, 712 (6th Cir. 1988). Based on the above, it is submitted that the ALJ's determination that Casterlow has the RFC to engage in medium work, that he can lift a maximum of fifty pounds occasionally, twenty-five pounds frequently, stand and/or walk for six hours and sit for two hours in an eight-hour workday, and that he can perform his past relevant work as a janitor and thus is not disabled, is supported by substantial evidence in the record.

## III. RECOMMENDATION

For the reasons above, the court submits that the ALJ's

findings are supported by substantial evidence and recommends that Casterlow's appeal be denied and the Commissioner's decision be affirmed.

Respectfully submitted,

s/ Tu M. Pham
_____

TU M. PHAM
United States Magistrate Judge

January 8, 2008
_____

Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**